*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DEPARTMENT OF LICENSING AND
REGULATORY AFFAIRS,

UNPUBLISHED
January 21, 2020

Petitioner-Appellee,

v

No. 345778
LARA Bureau of Professional
Licensing

KIRK DAVID DUNCAN, L.P.C.,

LC No. 17-019142

Respondent-Appellant.

Before: BOONSTRA, P.J., and TUKEL and LETICA, JJ.

PER CURIAM.

Respondent appeals by right the order of Board of Counseling Disciplinary Subcommittee (the Board), issued by its Authorized Representative, the Director of Bureau of Professional Licensing of the Department of Licensing and Regulatory Affairs (LARA), suspending respondent's license to practice as a licensed professional counselor for six months and one day and fining respondent $1,000.00 for violations of the Public Health Code. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Respondent is a fully licensed professional counselor, and has a Ph.D. in counseling. In 2015, he held a limited license as a professional counselor and a limited license as a psychologist, and worked as a limited licensed psychologist at the Eastwood Clinic, a part of the St. John Health System. In addition, respondent privately worked as a "life coach," although he was not certified as a life coach with any entity, had no training in life coaching, and was not part of any national associations related to life coaching. A life coach is not regulated by the State of Michigan, and is not subject to discipline under the Michigan Public Health Code.

Respondent stated that as a life coach he would provide his clients with "guidance on various topics," assist them in "finding ways to acquire new skills," and help them "achieve personal and career goals," all in a "directed fashion." Respondent advertised his life coaching services through a website, but in doing so did not refer to his limited licenses in counseling or

psychology. On August 27, 2015, respondent entered into a written agreement with SM, entitled "Statement of Working Relationship," outlining the terms under which respondent would provide SM with "consulting and life coaching services." The agreement provided:

> This document is to verify that [respondent] is a life coach which involves consulting and life coaching services.
>
> **At no time is [respondent] engaging in therapeutic services or psychotherapy.**
>
> The undersigned agree that a fee of:
>
> [$200.00 is circled]
>
> Per session in United States Currency unless otherwise noted for life coaching services and $100.00 missed appointment or late canceled less than 48 hours. [Emphasis in original.]

Respondent crossed out the term "Mr." before his name in the beginning of the agreement, and wrote in "Dr." to reflect his Ph.D. in counseling. Following his signature, he added in the credentials, Ph.D., L.L.P.C., L.L.P. and C.A.A.D.C. Under the signature line where respondent signed, it stated, "Life Coach." SM read and signed the agreement.

Respondent and SM met each other on a weekly basis for the next few months, and they also occasionally talked or texted on the phone, primarily as reminders for their meetings. The meetings were always held in public, at a library or a coffee shop. Over time, respondent motivated and assisted SM with respect to her wishes to move to a new location, to return to school, and to seek additional employment to supplement her income.

On December 27, 2015, respondent had been drinking alcohol, had an argument with his wife, and left his home. He eventually sent a text message to SM and asked if she was working; she was an Uber driver and lived nearby. Respondent then walked to her apartment, where she met him outside, and the two went into SM's apartment. According to respondent, he brought alcohol, at SM's request, which they both drank; he believed that SM was also smoking marijuana. Respondent stated that he and SM engaged in consensual sexual activity. However, SM reported to the police that respondent had sexually assaulted her, and obtained a personal protection order against him. The incident was investigated but no criminal charges were filed.

In 2016, SM notified St. John Health System of her intent to file a lawsuit against respondent for malpractice. As a result, respondent was terminated from his position as a counselor and therapist at Eastwood Clinic, based on workplace misconduct. However, according to respondent, this finding of misconduct was later "reversed by an administrative law judge [ALJ] for unemployment," who found that SM was not a patient of St. John Health System.

On March 13, 2017, petitioner filed an administrative complaint against respondent relating to his limited license for professional counseling. On June 28, 2017, petitioner filed a second administrative complaint relating to his limited license for psychology. The two cases were consolidated and heard together at a single administrative hearing before an Administrative Law Judge (ALJ). At the hearing, respondent denied that he had acted as SM's "therapist" or

that he had acted in any professional counseling capacity when he provided life coaching services to her, arguing that the agreement clearly stated that he was not providing counseling or therapeutic services. SM did not testify at the hearing. Petitioner's expert witness in counseling, Eugenia Patru, L.M.S.W., L.P.C., testified that respondent's life coaching services to SM likely included counseling components and counseling techniques employed while holding a limited license in professional counseling. She further testified that by signing the contract with his listed professional counseling credentials, respondent opened "the door to expectations" that he would be following the licensing requirements and minimum standards of care. Patru opined that respondent's decision to have sexual relations with SM, despite providing her a "counseling service" for which money was exchanged, was "egregious," "expressly forbidden," and a violation of the Public Health Code.

On December 20, 2017, the ALJ issued a Proposal for Decision (PFD) concluding that petitioner had failed to prove the alleged violations by a preponderance of the evidence, and recommending that the Board dismiss the complaint that had been filed against respondent.[1] However, on April 27, 2018, the Board rejected in part and accepted in part the PFD. On September 7, 2018, it issued its own findings of fact and conclusions of law, and determined that petitioner had demonstrated by a preponderance of the evidence that respondent had "violated his general duty, consisting of negligence, or failure to exercise due care, and conduct that impairs, or may impair, the ability to safely and skillfully practice as a counselor, and lacked good moral character," in violation of sections 16221(a) and (b)(vi) of the Public Health Code. The Board subsequently issued a final order concluding that respondent had violated the Public Health Code, suspending his counseling license, and issuing the subject fine.

This appeal followed.

## II. EXPERT TESTIMONY

Respondent argues that the ALJ erred by qualifying Patru as an expert witness because she lacked any training or experience in life coaching, and also was not a practicing professional counselor. Respondent further argues that the Board then erred by relying on Patru's testimony and opinion. We disagree.

Petitioner argues that respondent failed to preserve this issue for appeal. We disagree. Although respondent objected to Patru's qualifications at the October 18, 2017 administrative hearing, he did not raise the same arguments as exceptions to the PFD, or in his response to petitioner's exceptions to the PFD. This Court has previously ruled that the failure of a party to file exceptions to a PFD in a timely manner renders these issues unpreserved for appeal, even if the objections were raised at the underlying administrative proceeding. See *Attorney General v*

---

[1] The PFD also recommended that the Board of Psychology Disciplinary Subcommittee dismiss the complaint filed there against defendant. Respondent represents that, on April 11, 2018, the Board of Psychology Disciplinary Subcommittee did just that, dismissing the psychology complaint.

*Pub Serv Comm* 136 Mich App 52, 56; 355 NW2d 640 (1984) (holding that the failure to raise an issue in exceptions after raising it at the hearing resulted in a failure to preserve because "the appellant did not give the commission an opportunity to correct any alleged errors.") But our ruling in *Attorney General* was based on MCL 24.281, which provides that a party "adversely affected" by a PFD must be given an opportunity to file exceptions to it. See MCL 24.281(1). Here, the PFD recommended that both boards dismiss the complaints against respondent in their entirety. Respondent would not have been adversely affected by the PFD had it been adopted, and we conclude that he was not required under these circumstances to repeat his objections in the form of written exceptions to the PFD to preserve this issue for appeal.

Under Article 15 of the Public Health Code, judicial review of a disciplinary subcommittee's final order is limited to determining whether "competent, material and substantial evidence on the whole record" supports the order. *Dep't of Community Health v Risch*, 274 Mich App 365, 372; 733 NW2d 403 (2007). "Substantial evidence" means evidence that "a reasonable person would accept as sufficient to support a conclusion." *Dowerk v Oxford Charter Twp*, 233 Mich App 62, 72; 592 NW2d 724 (1998). While substantial evidence requires more than a "scintilla of evidence, it may be substantially less than a preponderance." *Dowerk*, 233 Mich App at 72. This Court will generally not disturb administrative findings of fact and conclusions of law, especially when they are based on credibility determinations, "because it is not the function of a reviewing court to assess witness credibility or resolve conflicts of evidence." *Risch*, 274 Mich App at 372. Additionally, this Court has found that "great deference should be given to an agency's administrative expertise." *Huron Behavioral Health v Dep't of Community Health*, 293 Mich App 491, 497; 813 NW2d 763 (2011).

The Michigan rules of evidence for civil cases "shall be followed as far as practicable" in contested cases before an administrative agency. MCL 24.275; *Nat'l Wildlife Fed v Dep't of Environmental Quality*, 306 Mich App 369, 376; 856 NW2d 394 (2014). Our Supreme Court has reviewed the qualification of a proposed expert witness at an administrative proceeding under the Michigan rules of evidence. See *In re Noecker*, 425 Mich 1, 12; 691 NW2d 440 (2005).

MRE 702 provides:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

We review for an abuse of discretion a trial court's ruling qualifying an expert witness. *Woodard v Custer*, 476 Mich 545, 557; 719 NW2d 842 (2006). A trial court has discretion regarding whether to accept or reject the qualifications of an expert. *Bahr v Harper Grace Hosp*, 448 Mich 135, 141, 528 NW2d 170 (1995). Before admitting expert testimony, the trial court must ensure that the expert testimony is reliable and relevant. *Chapin v A & L Parts, Inc*, 274 Mich App 122, 126; 732 NW2d 578 (2007). An expert's opinion is objectionable where

it is based on assumptions that are not in accord with the established facts. *Badalamenti v William Beaumont Hosp*, 237 Mich App 278, 286; 602 NW 854 (1999).

Respondent argues that Patru did not possess the relevant and requisite knowledge, skill, experience, training, and education necessary to offer opinions with respect to life coaching, which respondent claims is the only service he provided to SM. Moreover, respondent maintains that as a life coach, he would only provide SM with "guidance on various topics," assist her in "finding ways to acquire new skills," and help her "achieve personal and career goals." He asserts that rather than basing her opinion on these facts, Patru's opinions were based upon speculation and assumptions that respondent also offered SM some components of counseling services in addition to life coaching, and that the Board should not have relied on her opinions and testimony.

## A. QUALIFICATION

We conclude that the ALJ did not abuse its discretion by holding that Patru was qualified to testify as an expert witness. Patru's educational background includes a master's degree in guidance and counseling from the University of Michigan, and ongoing continuing education in "ethics" dating back to the 1980s. Moreover, Patru had the educational requirements necessary to obtain and maintain licensure as a professional counselor in the state of Michigan, and had met those requirements since 2012. Patru was thus qualified "by knowledge, skill, experience, training, or education" to testify regarding licensed professional counseling. MRE 702. The fact that she lacked clinical experience as a counselor in Michigan goes to the weight given to her testimony, but does not prohibit her from testifying as an expert under MRE 702. Moreover, the fact that Patru was not trained as a life coach did not disqualify her from determining whether respondent's services fell within the definition of counseling services, notwithstanding that they may have also fallen under the rubric of life coaching. Respondent has presented no evidence that life coaching and counseling services are mutually exclusive.

## B. TESTIMONY AND OPINION

We also conclude that the Board did not err by relying on Patru's testimony and opinion as an expert. Contrary to respondent's argument, Patru did not base her opinions on speculation and assumptions. The practice of counseling is defined in the Public Health Code as "the rendering to individuals . . . a service involving the application of clinical counseling principles, methods, or procedures for the purpose of achieving social, personal, career and emotional development . . . ." MCL 333.18101(d). Counseling principles are further defined, under MCL 333.18101(a)(ii) and (iv), to include providing "guidance" and "exploring alternative solutions." Thus, as Patru opined, counseling includes by definition services that respondent identified as life coaching, such as providing guidance and alternative solutions for the purpose of achieving social, personal, career, and emotional development. Patru testified about the significant overlap between counseling services and the life coaching services respondent provided, the trust and vulnerability that existed for his clients, and the need to uphold professional boundaries. Patru also noted that respondent signed the agreement with SM using his professional credentials. Respondent had stated that he crossed out the term "Mr." and wrote in the term "Dr." to reflect his doctorate in counseling because SM had asked if he was a doctor. Although respondent argued that SM was not aware of the meaning of his credentials, Patru's

-5-

opinion that the use of these credentials supported the conclusion that respondent was engaged in counseling services was not based on mere speculation or assumption. *Badalamenti*, 237 Mich App at 286.

Patru ultimately opined that, because respondent had provided at least some counseling services to SM, respondent's decision to sexually engage with her evidenced a lack of professional judgment that may impair his ability to skillfully and safely practice as a counselor in violation of section 16221(a) of the Public Health Code. See MCL 333.16221(a). She further stated that it demonstrated respondent's lack of propensity to serve the public in an open and honest manner, in violation of section 16221(b)(vi) of the Public Health Code. See MCL 333.16221(b)(vi). Patru's opinions were supported by the established facts and applicable statutory language. *Badalamenti*, 237 Mich App at 286.

We also note that a disciplinary subcommittee may rely on its own expertise in determining violations of the Public Health Code. *Dep't of Community Health v Anderson*, 299 Mich App 591, 600; 830 NW2d 814 (2013). It does not need expert testimony to determine that a respondent was negligent or lacking in good moral character where his conduct lacked basic elements of professional integrity. *Sillery v Bd of Med*, 145 Mich App 681, 688-689; 378 NW2d (1985). Therefore, even without Patru's testimony, the Board could have determined, using its own expertise, that the evidence as a whole demonstrated that respondent engaged in the practice of counseling, both by definition, based on the overlap of the services he provided to SM (as between counseling and life coaching), and because he used his licensing credentials in the agreement with SM. The Board's decision, even without Patru's testimony, was supported by competent, material, and substantial evidence on the record. *Dowerk*, 233 Mich App at 72.

III. RES JUDICATA/COLLATERAL ESTOPPEL

Respondent also argues that the final order from the Board of Psychology was never appealed, and thus was a final judgment on the merits. Therefore, respondent argues, the Board should be estopped under the doctrines of collateral estoppel or res judicata from issuing a final order contradicting the Board of Psychology's order. We disagree.

The applicability of collateral estoppel and other preclusion doctrines such as res judicata involve a question of law that we review de novo. *Minicuci v Scientific Data Mgt, Inc*, 243 Mich App 28, 34; 620 NW2d 657 (2000). Collateral estoppel precludes relitigation of an issue of fact or law that was decided by a final judgment in a prior action. *Detroit v Qualls*, 434 Mich 340, 357; 454 NW2d 374 (1990). "Generally, application of collateral estoppel requires that (1) the issue was actually litigated and determined by a valid and final judgment, (2) the same parties had a full and fair opportunity to litigate the issue, and (3) there is mutuality of estoppel." *Wells Fargo Bank, NA v Null*, 304 Mich App 508, 520; 847 NW2d 657 (2014). The issue to be decided must be identical to the one decided in a prior action, and not merely similar. *Keywell & Rosenfeld v Bithell*, 254 Mich App 300, 340; 657 NW2d 759 (2002). Res judicata precludes relitigation of *claims* that were previously decided on the merits. *Bhama v Bhama*, 169 Mich App 73, 81; 425 NW2d 733 (1988). The elements of res judicata are that: (1) the prior action was decided on the merits, (2) the decree in the prior action was a final decision, (3) the matter contested in the second case was or could have been resolved in the first, and (4) both actions

-6-

involved the same parties or their privies. *Peterson Novelties, Inc v City of Berkley*, 259 Mich App 1, 10; 672 NW2d 351 (2003).

Respondent points out that the factual circumstances involved here are the same in both complaints. He argues that the issue is also the same in both cases, i.e., whether by his interactions with SM violated the Public Health Code. We disagree. The Board of Psychology's final order dismissing petitioner's complaint regarding respondent's *psychology* license does not prevent or preclude the Board from making its own determination regarding respondent's *counseling* license. The two Boards regulate separate and distinct areas of mental health practice, requiring separate licensure, with different skill sets and educational requirements and subject to different standards of care. Collateral estoppel only applies if the issue to be decided is identical to the one decided in a prior action, not merely similar. *Keywell*, 254 Mich App at 340. Further, res judicata requires that the matter contested in the second case "was or could have been resolved in the first" case. *Peterson Novelties*, 259 Mich App at 10. The Board of Psychology has no authority over respondent's counseling license and could not have suspended it or otherwise penalized respondent under that license. The Board was not bound by the previous decision of a different disciplinary subcommittee concerning a different license.

Affirmed.

/s/ Mark T. Boonstra
/s/ Jonathan Tukel
/s/ Anica Letica